**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-16 (TNM)** |
| **v.** | : | |
| | : | |
| **ANGEL VILLANUEVA,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this consolidated sentencing memorandum in connection with the above-captioned matter. The defendants, Angel Villanueva and Thomas Pooler, have each agreed to plead guilty to two Class B misdemeanors, violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Villanueva to 6 months of incarceration on Count One and 36 months of probation on Count Two. The government requests that the Court sentence Pooler to 30 days of incarceration on Count One and 24 months of probation on Count Two. The government also requests that this Court impose, consistent with the plea agreement in this case, $500 in restitution as to each defendant.

### I.      Introduction

The defendants, Angel Villanueva and Thomas Pooler, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The government's recommendation as to Villanueva is supported by (1) Villanueva's entry through the damaged Senate Wing Doors amid blaring alarms; (2) the length of time he remained inside the Capitol (31 minutes); (3) his participation in a physical confrontation between rioters and police on the Upper West Terrace; and (4) most critically, the fact that he carried pepper spray, metal tipped darts, and a pocket-knife into the Capitol.  The government's recommendation as to Pooler is supported by (1) his entry into the Capitol through the damaged Senate Wing Doors amidst the blaring alarms; and (2) the length of time he remained inside the Capitol (29 minutes). Because, to the government's knowledge, Pooler did not bring weapons into the Capitol building and did not participate in any physical confrontation, the requested higher sentence for Villanueva is appropriate.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.  But for their actions alongside so many others, the riot likely would have failed.  Here, the facts and

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

circumstances of the pair's crimes support a sentence of 6 months incarceration for Villanueva and 30 days incarceration for Pooler.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to ¶¶ 1-7 of the Statements of Offense, signed by Villanueva and Pooler.

### *Villanueva and Pooler's Roles in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Villanueva and Pooler drove from Florida to Washington D.C. in Pooler's truck.  On the morning of January 6, 2021, Villanueva and Pooler attended former President Trump's "Stop the Steal" rally.  There, they posed for photographs, at least one of which they subsequently posted on social media.



*Images 1A and 1B: Pooler (left in both) and Villanueva (right in both)*
*near the Washington Monument*

As former President Trump's speech was wrapping up, Villanueva and Pooler—along with others in the crowd—marched to the U.S. Capitol, where they saw rioters physically

battling police amidst clouds of tear gas.  They observed people on the side of the walls of the U.S. Capitol building and on the scaffolding, and saw barriers that had been overturned.  Despite the violence and the clear signs that they were not authorized to enter, Pooler and Villanueva followed the crowd and climbed up and over a concrete barrier onto the U.S. Capitol building's Upper West Terrace.

At approximately 2:26 p.m., Villanueva and Pooler entered the U.S. Capitol building through the Senate Wing Doors, despite the fact that the door and windows were broken, and alarms were sounding. Villanueva entered first, holding his cell phone, with Pooler close behind him, holding on to Villanueva's backpack with one hand and carrying two flag poles with the other.  As they entered, both men pulled up their face coverings.



*Image 2: Villanueva (left) and Pooler (right), immediately after entering*
*the Capitol through the Senate Wing Doors*

After entering, Pooler and Villanueva turned right and walked into the Rotunda. They stayed in that room for approximately one minute. After leaving the Rotunda, Villanueva and Pooler walked through Statuary Hall. At that point, around 2:30 p.m., they were separated. Both Villanueva and Pooler remained in the Statuary Hall connector corridor for at least ten minutes.

Villanueva turned around and retraced his steps while Pooler continued forward. At approximately 2:41 p.m., Pooler emerged in the hallway near House of Representatives office 208 and began jogging down the hall with a crowd of other rioters and in the direction of the East Stairs.



*Image 3: Pooler near the East Stairs*

At 2:54 p.m., Pooler walked past the magnetometer near the East Front House Door and exited the U.S. Capitol building.  In total, Pooler spent approximately 29 minutes inside the building.



*Image 4: Pooler exiting the Capitol through the East Front House Door*

Turning back to Villanueva, at 2:46 p.m. Villanueva walked through Statuary Hall in the opposite direction from Pooler, *i.e.*, toward the Rotunda.  Villanueva entered the Rotunda approximately one minute later and stayed there for eight minutes.  He exited the Rotunda and went back the way he had originally come.  At approximately 2:57 p.m., Villanueva exited by climbing through the broken window to the left of the Senate Wing Door.  In total, Villanueva spent approximately 31 minutes inside the U.S. Capitol building.



*Image 5: Villanueva exiting through a window of the Senate Wing Door (distinguishable by the American Flag backpack)*

Just under 30 minutes later, at approximately 4:21 p.m., Villanueva was still on the Upper West Terrace of the U.S. Capitol grounds. At that time, a fight broke out between a crowd of rioters and police officers trying to clear the area. As the officers moved forward, a group of rioters pushed back against the line of police officers. During the confrontation, one rioter struck an officer with a wooden board. Another threw a Confederate flag attached to a metal pole at the officers. Villanueva joined the crowd engaged in the confrontation with police officers. In one instance, Villanueva briefly placed his hands on the backpack of another rioter who was pushing against an officer, lending his weight to that assault. Villanueva's hat was knocked off his head during the process. In another instance, Villanueva again moved to the front of the group of

rioters pushing against the police line, and joined that push, although it's difficult to discern from the video whether he made physical contact with the police officers.



*Image 6A: Villanueva engaging with the police line on the Upper West Terrace*



*Image 6B: Villanueva engaging with the police line on the Upper West Terrace*

8

A video depicting the latter incident with police will be shared with the Court and marked as Exhibit 1.

*Defendant Villanueva's Interviews*

Villanueva was initially contacted by the FBI in July 2021.  Subsequently, and he agreed to a voluntary interview with his attorney.  During that interview, Villanueva confirmed his travel to Washington, D.C. on January 5, 2021, and identified his travel companion as Thomas Pooler.  Villanueva provided details regarding his entry onto restricted Capitol grounds, including that he moved past barriers that were overturned or moved, and that he climbed over a concrete barrier to access the Capitol.  Villanueva stated that he and Pooler entered the Capitol through a window, and believed that he exited through that same window.  Villanueva also admitted that, on January 6th, he carried a can of pepper spray, metal tipped darts, and a pocket-knife.  Villanueva stated that those items were strictly in case they got "mobbed" and that he never brandished those items, or used them, on January 6th.  He indicated the pepper spray was "for Antifa."  During his interview with FBI, Villanueva did not mention his confrontation with police on the Upper West Terrace.

Villanueva participated in another voluntary interview with the FBI on October 18, 2021. During that interview, was shown photographs from January 6th.  He identified himself and Thomas Pooler in those photographs.

*The Charges and Plea Agreement*

On January 5, 2024, and February 8, 2024, the United States charged Villanueva and Pooler, respectively, by two-count Informations, charging violations of 40 U.S.C. § 5104(e)(2)(D) and (G).  Both defendants are scheduled to plead guilty to those two counts on March 20, 2024. By Order of the Court, the defendants will proceed to sentencing the same day.  ECF No. 5

(Standing Order).   Pursuant to the plea agreement, both defendants agreed to pay $500 in restitution to the Architect of the Capitol.

### III.      Statutory Penalties

As the defendants are pleading to offenses that are both Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In these misdemeanor cases, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  As to defendant Pooler, as described below, the Section 3553(a) factors weigh in favor of 30 days of incarceration.  As to defendant Villanueva, as described below, the Section 3553(a) factors weigh in favor of a significantly longer period of 6 months incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Villanueva and Pooler's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Pooler, the absence of violent or destructive acts is not a mitigating factor. Had Pooler engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Pooler's case is his entry into the Capitol amidst fighting on the western front, through the broken Senate Wing Doors as the alarms were blaring.

Accordingly, the nature and the circumstances of this offense establish the clear need for a short sentence of incarceration in this matter.

Villanueva's case presents more aggravating factors.  Not only did he enter through the damaged Senate Wing Doors, but he was involved in a confrontation with police on the Upper West Terrace after exiting the building.  Significantly, Villanueva carried three different types of weapons on his person as he roamed unfettered through the halls of the Capitol (i.e., pepper spray, metal tipped darts, and a pocketknife).  Although Villanueva cooperated with the FBI and offered information as to Pooler, the aggravating factors still militate in favor of a significantly longer prior of incarceration.

### B. History and Characteristics

The government has uncovered no information that either Pooler or Villanueva have any prior criminal history.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.  What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Villanueva and Pooler weighs in favor of incarceration. Villanueva and Pooler, as laid out in their Statements of Offense, were aware that the Congressional certification of the 2020 Electoral College vote taking place at the Capitol on January 6th. Despite that, both of them joined the mob on the West front and entered the Capitol building. While Pooler appeared to leave the grounds soon after exiting the building, Villanueva remained and joined rioters who were facing off against police. Villanueva joined the line pushing against the police. *See* Exhibit 1. Further, Villanueva admitted to bringing weapons to Washington, D.C. and carrying them on Capitol grounds. Although both defendants are accepting responsibility by entering into a plea agreement, their actions on January 6th, particularly those of Villanueva, justify a period of incarceration to deter them from ever going down that road

12

again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2]  This Court must sentence Villanueva and Pooler based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Villanueva and Pooler are pleading guilty to two counts, charging violations of 40 U.S.C. § 5014(e)(2)(D) and (G).  Although the offenses are "petty offenses" to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

cases.  Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity.  But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records.  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present

here, the sentence in the following case provides suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Andrew Ericson*, D.D.C. 21-cr-506 (TNM), the defendant (1) penetrated the U.S. Capitol all the way to the Speaker's conference room and office space; (2) trivialized the level of his intrusion by posing with his feet on the Speaker's conference room table and taking a beer out of a mini refrigerator; (3) saw police officers overrun by the crowd of rioters; (4) recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing; (5) deleted his Facebook and Snapchat accounts, although it is not clear this was done in an attempt to destroy incriminating evidence; and (6) appears to have a general lack of remorse.  This Court sentenced Ericson to 20 days incarceration, to be served on consecutive weekends.  That sentence is similar to the government's recommendation for Pooler, but lower than the recommendation for Villanueva. However, unlike Ericson, Villanueva carried three weapons with him inside of the Capitol, and joined a confrontation of police on the Upper West Terrace after he left the building.  The government urges the Court to impose a significantly higher sentence on Villanueva than it did on Ericson.

Pooler and Villanueva's cases can also be compared with *United States v. Jared Cantrell*, D.D.C. 22-cr-121 (TNM).  Cantrell did not plead guilty, but opted for a bench trial, in which this Court convicted him on three counts: violations of 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(G).  Cantrell, like Villanueva and Pooler, reached the Capitol after traversing through downed barriers and scaffolding, entered the Capitol despite blaring alarms, and stayed inside the Capitol for a lengthy period of time.  Villanueva and Pooler actually remained in the Capitol longer than Cantrell—30 minutes as opposed to 10 minutes.  This Court sentenced Cantrell to 6 months of incarceration—the same as the government's recommendation for Villanueva.  Although

15

Villanueva, unlike Cantrell, does not have a criminal history, Villanueva carried three weapons with him inside of the Capitol, and joined a confrontation of police on the Upper West Terrace *after* he left the building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3]   Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the defendants must each pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[4] Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of March 2024." *Id.*  Pooler and Villanueva's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence defendant Pooler to 30 days incarceration as to Count One, and 24 months of probation as to Count Two.  The government recommends that the Court sentence defendant Villanueva to 6 months incarceration as to Count One, and 36 months of probation as to Count Two.  The sentences requested would protect the

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

community, promote respect for the law, and deter future crime by imposing restrictions on the defendants' liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Sarah C. Martin*
        Assistant United States Attorney
        Sarah C. Martin